# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 29 2016, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:,

A.H. (Child),

and,

M.L. (Father),

Appellant-Respondent,

July 29, 2016

Court of Appeals Cause No.
28A01-1601-JT-209

Appeal from the Greene Circuit Court

The Honorable Erik C. Allen. Judge

Trial Court Cause No.
28C01-1503-JT-90

v.

The Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

[1] M.L. ("Father") appeals the termination of his parental rights to A.H. We
affirm.

# Issue

[2] Father raises one issue, which we restate as whether the trial court properly
found a reasonable probability that the conditions resulting in A.H.'s removal
will not be remedied.

# Facts

[3] A.H. was born to Father and T.H. ("Mother") in May 2008. In October 2010,
Father was awarded custody of A.H. In approximately February 2013, Father's
girlfriend, B.I., moved in with him and A.H. On October 2, 2013, Father was
at work, and B.I. complained about five-year-old A.H. to Father. When Father
returned home from work, A.H. had bruises on his face. Father then spanked
A.H. with a wooden board, sprayed cold water onto A.H.'s face for several

minutes, and "flicked" his penis because A.H. had wet the bed. Tr. p. 589. The next evening, Father had to take A.H. to a babysitter when he went to work. The babysitter noticed the bruising to A.H. and called the Department of Child Services ("DCS"). A.H. was transported to the Green County Hospital. A.H. had extensive bruises around his eyes and on his face, upper chest, back, and arms. He also had a "goose egg" on his forehead and "linear" red marks around his neck that were "indicative of strangulation." *Id.* at 197, 212. A.H. told investigators that Father and B.I. physically abused him, including "whippings with a board, whipping with open hands and closed hands, choking, using water, throwing him against walls, and slamming him onto the ground." Ex. 6, p. 1.

[4] DCS removed A.H. from Father's care and placed him in foster care with his paternal great aunt and uncle. DCS filed a petition alleging that A.H. was a child in need of services ("CHINS"), and Father admitted that A.H. was a CHINS. The trial court ordered Father, in part, to complete a parenting assessment and psychological evaluation and follow all recommendations. Ultimately, Father was convicted of Class D felony neglect of a dependent and was sentenced to serve two and one-half years. Father was released from jail in July 2014.

[5] Father participated in services, including a psychological evaluation and therapy. Therapist Christine Pryor gave Father a preliminary diagnosis of "intermittent explosive disorder, anti-social features, anxiety disorder, NOS, and parent child relational problem." Tr. p. 286. Psychologist Sarah Szerlong

initially diagnosed Father with an anxiety disorder with some paranoid features. Additionally, Pryor tried working with Father on personal anger management and "identifying and utilizing more appropriate forms of punishment" to a child and gaining insight and a more empathic response. *Id.* at 290. Father made little progress toward gaining insight. Pryor saw little empathy for A.H. from Father. Father believed that A.H. should "face his fears and move on." *Id.* at 503. Father refused to take medications that were prescribed for him. Although there were times that Father appeared to be crying while discussing A.H., Pryor never saw any tears, which indicated deception to her and is often seen in anti-social people. Father had "bizarre behaviors," including smiling at inappropriate times. *Id.* at 294. Father later worked with therapist Regina Hildenbrand-Moore. Hildenbrand-Moore's diagnostic impression of Father was that he had anti-social and narcissistic personality disorders. She also saw limited progress in Father reaching his therapy goals.

[6] After his removal from Father, A.H. was initially very quiet. After a few weeks, he began to exhibit signs of trauma, including "fits" and "meltdowns." *Id.* at 307. His foster parents determined certain triggers for the meltdowns or fits, including bath time, driving past Father's house, and Taco Bell (Father's former employer). A.H. was initially diagnosed with post-traumatic stress disorder and possibly ADHD. During kindergarten, A.H.'s foster mother had to attend school with him each day. A.H. has severe post-traumatic stress disorder and is "very fearful" of Father. *Id.* at 388.

[7] After Father's release from jail, A.H.'s therapist started contact between A.H. and Father through letters, then telephone calls, and then supervised visits. When A.H. started receiving telephone calls from Father, A.H.'s meltdowns and fits increased. When face-to-face visits with Father started, the meltdowns and fits increased even more. A.H.'s behaviors became "extreme." *Id.* at 380. In June 2015, the trial court ordered that face-to-face visits between Father and A.H. stop.

[8] DCS filed a petition to terminate Father's parental rights.[1] After an evidentiary hearing, the trial court issued findings of fact and conclusions thereon terminating Father's parental rights. Father now appeals.

## Analysis

[9] Father challenges the termination of his parental rights to A.H. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize, of course, that parental interests

---

[1] Mother filed a consent for adoption.

are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[10] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[11] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section

31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)  that one (1) of the following is true:
>
> > (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and
>
> (D)  that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

[12]  Father argues only that the trial court's conclusion that the conditions resulting in A.H.'s removal will not be remedied is clearly erroneous. Father does not challenge the trial court's conclusion that there is a reasonable probability the continuation of the parent-child relationship poses a threat to A.H.'s well-being.

Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Subsection (b)(2)(B)(iii), which concerns repeated CHINS adjudications, is inapplicable here. Consequently, DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in A.H.'s removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of A.H. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*. The trial court concluded *both* that the conditions resulting in A.H.'s removal will not be remedied and that the continuation of the parent-child relationship poses a threat to A.H.'s well-being. By failing to challenge the trial court's conclusion regarding a threat to A.H.'s well-being, Father has implicitly conceded the sufficiency of (b)(2)(B)(ii) and has effectively waived review of the trial court's determination under Indiana Code Section 31-35-2-4(b)(2)(B).

[13] Waiver notwithstanding, the trial court's determination that the conditions resulting in A.H.'s removal will not be remedied is not clearly erroneous. In making this determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.*

Father argues that his supervised visits with A.H. were positive and that they had a loving relationship. Father points out that Dr. Jeffrey Huttinger, a clinical psychologist, testified that Father was remorseful and that A.H. needed more visitation with Father. However, Dr. Huttinger only had two one-hour sessions with Father and A.H. The therapists that spent many hours with Father and A.H. testified that continued contact between Father and A.H. was harmful to A.H. and that Father made little progress in gaining empathy or understanding of A.H.'s feelings. The DCS case worker testified that A.H. has severe post-traumatic stress disorder and is "very fearful" of Father. Tr. p. 388. When contact with Father was increased, A.H. had "pretty serious acting out behaviors at home as well as at school." *Id.* Despite extensive therapy for both Father and A.H., there was little progress in repairing A.H.'s relationship with Father. The trial court found a reasonable probability that the conditions that resulted in A.H.'s remove and continued placement outside Father's home would not be remedied. Given the lack of progress in repairing the relationship between Father and A.H., we cannot say that this conclusion is clearly erroneous.

## Conclusion

The trial court properly found a reasonable probability that the conditions resulting in A.H.'s removal will not be remedied. The evidence is sufficient to sustain the termination of Father's parental rights to A.H. We affirm.

Affirmed.

Vaidik, C.J., and Mathias, J., concur.